FILED

08/25/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0012

DA 20-0012

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 216

POPLAR ELEMENTARY SCHOOL DISTRICT NO. 9,

>   Petitioner and Appellant,

>   v.

FROID ELEMENTARY SCHOOL DISTRICT NO. 65,

>   Respondent and Appellee.

APPEAL FROM:   District Court of the Fifteenth Judicial District,
In and For the County of Roosevelt, Cause No. DV 18-82
Honorable David J. Cybulski, Presiding Judge

COUNSEL OF RECORD:

>   For Appellant:

>   Elizabeth A. Kaleva, Elizabeth O'Halloran, Kaleva Law Office, Missoula, Montana

>   For Appellee:

>   Jeff A Weldon, Kyle A. Moen, Felt Martin PC, Billings, Montana

>   For Intervenor:

>   Timothy C. Fox, Montana Attorney General, J. Stuart Segrest, Civil Bureau Chief, Aislinn W. Brown, Assistant Attorney General, Helena, Montana

>   Submitted on Briefs:  June 24, 2020

>   Decided:  August 25, 2020

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Poplar Elementary School District No. 9 ("Poplar") appeals the order of the Fifteenth Judicial District Court, Roosevelt County, affirming the Acting Roosevelt County Superintendent of School's ("Acting Superintendent") grant of a territory transfer from Poplar to Froid Elementary School District No. 65 ("Froid") pursuant to § 20-6-105, MCA (the "territory transfer statute"). Poplar asserts that the Acting Superintendent's decision constituted an abuse of discretion and that the District Court erred in affirming it. Poplar further contends that the territory transfer statute is unconstitutional, both facially and as applied to Poplar. We conclude that the Acting Superintendent did not abuse her discretion; that Poplar's facial constitutional challenge is barred by the doctrines of collateral estoppel and res judicata; and that its as-applied challenge fails because a school district does not have a constitutional right to due process. We accordingly affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     This case arises from an ongoing dispute over the transfer of territory from Poplar to Froid. *See In re the Pet. to Transfer Territory from Poplar Elementary Sch. Dist. No. 9 to Froid Elementary Sch. Dist. No. 65*, 2015 MT 278, 381 Mont. 145, 364 P.3d 1222 ("*Poplar I*"). The territory in question ("Transfer Territory") includes 127,689.3 acres located in Poplar. The Transfer Territory is contiguous to Froid and is already part of Froid High School District 65E. As of the filing of the petition at issue, there were eleven school-age children living in the Transfer Territory.

¶3     In 2013, Froid's Board of Trustees, along with a group of registered electors in Roosevelt County, petitioned the Roosevelt County Superintendent of Schools to transfer

the Transfer Territory. *Poplar I*, ¶ 3. Poplar opposed the transfer. *Poplar I*, ¶ 3. The county superintendent appointed a deputy superintendent, Paul Huber, to hear and decide the petition as required by the territory transfer statute. *Poplar I*, ¶ 3.

¶4 In June 2013, after a hearing, Huber issued his findings of fact, conclusions of law, and order approving the territory transfer. *Poplar I*, ¶ 8. Poplar appealed to the district court, and both parties filed cross-motions for summary judgment. *Poplar I*, ¶ 8. Poplar contended that: (1) the territory transfer statute is an unconstitutional delegation of legislative authority; (2) the county superintendent violated Poplar's due process rights by appointing Huber as deputy; (3) Huber violated Poplar's due process rights by, among other things, admitting unsworn statements; and (4) Huber's decision to transfer territory from Poplar to Froid was an abuse of discretion. *Poplar I*, ¶ 8.

¶5 The district court, Judge John McKeon presiding, ruled in favor of Froid with respect to Poplar's facial constitutional challenge. In a detailed analysis, the court rejected Poplar's argument that the statute fails to prescribe "any objective policy, standard, or rule of guidance" to appropriately limit a county superintendent's discretion in granting or denying a transfer petition. Applying the presumption of constitutionality and rules of statutory construction, the court held the statute constitutional as a matter of law. The district court also rejected Poplar's as-applied constitutional challenges.

¶6 The district court agreed with Poplar, however, that Huber's failure to administer oaths to numerous witnesses constituted an abuse of discretion, awarded summary judgment to Poplar, and vacated Huber's findings of fact, conclusions of law, and order transferring the territory to Froid. *Poplar I*, ¶ 9.

3

¶7     Froid appealed the latter rulings to this Court. *Poplar I*, ¶ 9. Poplar did not cross-appeal the ruling on the constitutionality of the territory transfer statute. We held that the district court erred in resolving the question whether § 20-6-105, MCA, required sworn testimony because Poplar failed to object at the transfer hearing to Huber's allowance of unsworn testimony and thus failed to preserve the challenge for appeal. *Poplar I*, ¶¶ 19-20. We accordingly reversed and remanded for "further proceedings in review of the county superintendent's decision[.]" *Poplar I*, ¶ 21.

¶8     On remand, the district court ruled that certain of Huber's findings and conclusions were unsupported by the record and thus that Huber abused his discretion in approving the territory transfer. Froid appealed to this Court but voluntarily dismissed the appeal in September 2016. *See In re Pet. to Transfer Territory from Poplar Elementary Sch. Dist. No. 9 to Froid Elementary Sch. Dist. No. 65*, DA 16-0413.

¶9     On November 20, 2017, Froid filed a new petition to transfer the Transfer Territory. This time, the county superintendent appointed Jayne Mitchell as Acting Superintendent to preside over the hearing on Froid's petition. The Acting Superintendent held a hearing on August 9, 2018, and issued her Findings of Fact, Conclusions of Law, and Order approving the transfer two months later. Poplar appealed to the District Court, Judge David Cybulski presiding, arguing that the Acting Superintendent abused her discretion in applying the transfer statute. Poplar also raised a facial constitutional challenge to the transfer statute identical to the one it raised before Judge McKeon, as well as an as-applied constitutional challenge. On December 9, 2019, the District Court issued its Order on Petition for Judicial Review affirming the Acting Superintendent's decision.

4

Poplar appeals. The Attorney General intervened for the limited purpose of defending the constitutionality of the territory transfer statute.

## STANDARDS OF REVIEW

¶10 A district court reviews a county superintendent's decision regarding a territory transfer petition for an abuse of discretion. *In the Matter of Pet. to Transfer Territory from Dutton/Brady K-12 Sch. Dist. No. 28C to Conrad High Sch. and Elementary Dist. No. 10*, 2011 MT 152, ¶ 7, 361 Mont. 103, 259 P.3d 751 ("*Dutton*") (citing § 20-6-105(9), MCA). An abuse of discretion occurs when a tribunal acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason, resulting in substantial injustice. *Dutton*, ¶ 7 (citation omitted).

¶11 This Court's review of constitutional questions is plenary. *Williams v. Bd. of Cty. Comm'rs*, 2013 MT 243, ¶ 23, 371 Mont. 356, 308 P.3d 88. We review a district court's conclusions of law, including the constitutionality of a statute, for correctness. *Williams*, ¶ 23.

## DISCUSSION

¶12 *1. Did the District Court correctly determine that the Acting Superintendent did not abuse her discretion in granting Froid's petition to transfer the Transfer Territory?*

¶13 Section 20-6-105(6), MCA, sets forth criteria that a county superintendent must consider in determining whether to grant or deny a petition for transfer of territory from one school district to another. In relevant part, the superintendent must weigh the effect that the proposed transfer will have on the following factors:

(a) the educational opportunity for the students in the receiving and transferring districts, including but not limited to:
(i) class size;
(ii) ability to maintain demographic diversity;
(iii) local control;
(iv) parental involvement; and
(v) the capability of the receiving district to provide educational services;
(b) student transportation, including but not limited to:
(i) safety;
(ii) cost; and
(iii) travel time of students;
(c) the economic viability of the proposed new districts, including but not limited to:
(i) the existence of a significant burden on the taxpayers of the district from which the territory will be transferred;
(ii) the significance of any loss in state funding for the students in both the receiving and transferring districts;
(iii) the viability of the future bonding capacity of the receiving and transferring districts, including but not limited to the ability of the receiving district and the transferring district to meet minimum bonding requirements;
(iv) the ability of the receiving district and the transferring district to maintain sufficient reserves[.]

Section 20-6-105(6), MCA. "If, based on a preponderance of the evidence, the county superintendent determines that the evidence on the effects described in subsection (6) supports a conclusion that a transfer of the territory is in the best and collective interest of students in the receiving and transferring districts and does not negatively impact the ability of the districts to serve those students, the county superintendent shall grant the transfer." Section 20-6-105(8), MCA.

¶14 Here, the Acting Superintendent made specific findings with respect to each effect described in the territory transfer statute and concluded that, "[b]ased upon a preponderance of the evidence, the evidence of the effects described in [§ 20-6-105(6), MCA,] supports a conclusion that the transfer of the Territory is [in] the

6

best and collective interest of the students in the receiving and transferring districts and does not negatively affect the ability of the districts to serve those students."

¶15 Poplar contends that under the plain language of the transfer statute, the finding of "any negative impact at all" on either Poplar or Froid should preclude the transfer. It asserts that the Acting Superintendent ignored evidence of multiple negative impacts on Poplar and Froid and thus that her decision to grant the transfer constitutes an abuse of discretion. Specifically, Poplar contends that the hearing evidence demonstrated that the proposed transfer will result in a significant tax burden on Poplar residents and in a loss in funding for its students; that the Acting Superintendent impermissibly considered evidence of other funding to offset these financial burdens; and that, contrary to the Acting Superintendent's determination, the transfer would not positively impact transportation for Froid. We address each contention in turn.

**Tax burden**

¶16 "[T]he burden imposed on taxpayers within the district from which the territory will transfer is a factor the [county superintendent] must consider[]" in applying § 20-6-105(6), MCA. *Dutton*, ¶ 15. The Acting Superintendent made the following relevant findings with respect to the potential tax burden of the proposed territory transfer:

> 32. The current taxable value of the Transfer Territory is $2,246,517. Transferring the Territory would shift the taxable value of the Territory from [Poplar] to [Froid].
>
> 34. The taxes assessed, based on Poplar's adopted base budget millage, generates [sic] $411,000 for [Poplar].
>
> 35. The Transfer could affect the residential property tax payers in [Poplar] but not in a material or significant way. The tax increase would amount to

7

$24.29 on a house valued at $100,000 or on a $50,000 house there would be an increase of $12.

36. The proposed transfer represents a decrease in [Poplar's] bonding capacity by 15.47% and a corresponding increase in [Froid's] bonding capacity. Poplar's bonding capacity would still remain viable even after the transfer.

Based on these findings, the Acting Superintendent concluded that the "burden on the taxpayers of the Poplar School District is negligible, . . . that the bonding capacity of both districts i[s] not significantly affected, and that Poplar School District will be able to maintain sufficient reserves."

¶17 Poplar asserts that this determination "minimized" or "ignored" testimony from the August 2018 territory transfer hearing suggesting that the transfer would cause a 26% loss in Poplar's taxable valuation, a 36.6% tax increase for Poplar taxpayers, and a reduction in Poplar's bonding capacity of up to 27%[1]—all relevant considerations under the territory transfer statute. Relying on our holding in *Dutton*, Poplar argues that these factors "gravitate[] against approval" of the territory transfer petition.

¶18 In *Dutton*, ¶ 6, a territory transfer panel denied Conrad High School and Elementary Districts' ("Conrad") petition to transfer to Conrad territory from Dutton-Brady K-12

---

[1] Poplar asserts that the Acting Superintendent overlooked the territory transfer's full impact on its bonding capacity. Specifically, it points to testimony from Froid Superintendent Ken Taylor that a bonded project related only to the elementary district would reduce Poplar's bonding capacity by 27%. The Acting Superintendent's findings mention a 15.47% reduction in bonding capacity, a figure that includes Poplar's High School District. As Froid correctly notes, however, the Acting Superintendent is charged with considering the viability of the districts' future bonding capacity. She heard testimony that Poplar had no bonded debt as of 2018 and that it can bond 100% of its bonding capacity. The Acting Superintendent's finding was based on the testimony and evidence presented and does not demonstrate an abuse of discretion in light of the entire record.

8

School District ("Dutton-Brady"). The panel determined that the transfer was not in the collective best interests of the Conrad and Dutton-Brady students based in part on the 43% reduction in Dutton-Brady's taxable value and a 50% increase in taxes for Dutton-Brady landowners. *Dutton*, ¶¶ 11-12. The district court affirmed, noting that the panel "considered the evidence of the transfer's effects, as provided in § 20-6-105(6), MCA, and 'acted with reason, consideration, and an understanding of [its statutory] obligation[.]'" *Dutton*, ¶ 13. The court further concluded that the tax implications for Dutton-Brady were substantial and, standing alone, supported the panel's conclusion. *Dutton*, ¶ 13. We affirmed the district court's review, reasoning that the "panel, in accordance with § 20-6-105, MCA, carefully evaluated the effects of the proposed transfer and made its decision based upon the best and collective interests of all students involved." *Dutton*, ¶ 15.

¶19 Poplar asserts that because the territory transfer at issue will impose a significant tax burden on Poplar taxpayers comparable to that in *Dutton*, the Acting Superintendent should have denied the transfer request like the panel did in that case. But as Froid points out, our holding in *Dutton* does not establish a threshold at which point a tax burden becomes unreasonable or requires the denial of a territory transfer petition. Rather, the specific figures and percentages referenced in *Dutton* demonstrated the panel's careful consideration of the economic viability of the proposed transfer in accordance with its statutory obligation. As we explained, "[a]lthough Conrad Schools may disagree with the panel's findings and conclusions, nothing in the record before us indicates the panel acted arbitrarily or capriciously in issuing its decision." *Dutton*, ¶ 15.

9

¶20 Although the Acting Superintendent reached an outcome different from that in *Dutton*, she employed the same "careful[] evaluat[ion]" in applying the criteria of § 20-6-105(6), MCA. The Acting Superintendent's findings and conclusions with respect to the territory transfer's tax burden find substantial support in the testimony of multiple witnesses at the territory transfer petition hearing. Froid Superintendent Ken Taylor testified that, for Poplar taxpayers, the transfer would add $24.29 of "additional taxation per year" to a house valued at $100,000; $12 of additional taxation per year to a house valued at $50,000; $48.58 of additional taxation per year to a house valued at $200,000, and so forth. Taylor based his testimony on over twenty pages of data he compiled from the Office of Public Instruction in preparation for the hearing. Poplar School District Board chairperson Deborah McGowan testified that, based on conversations she had with four or five neighbors, even a $25 per year tax increase would "significant[ly] burden" roughly half of Poplar taxpayers, but then conceded on cross-examination that she did not discuss "specific numbers" with any of the individuals. And Poplar Superintendent Dan Schmidt testified that the transfer would burden Poplar taxpayers, but provided no support for this assertion other than "I just don't see that being a reasonable amount[,]" and admitted that $25 was not a significant amount to him personally.

¶21 We conclude that despite the presentation of evidence to the contrary, the record does not reflect that the Acting Superintendent acted arbitrarily or capriciously when she concluded that the territory transfer would not impose a significant tax burden on Poplar taxpayers. Her decision was supported by a preponderance of the evidence presented at the hearing, *see Dutton*, ¶ 15, and thus did not constitute an abuse of discretion.

10

**Impact Aid**

¶22 The Acting Superintendent determined that Poplar's access to Federal Impact Aid and state guaranteed tax base ("GTB") funding would alleviate any tax revenue loss the territory transfer may cause. She made the following relevant findings:

> 13. The loss of state funding for the students in [Froid and Poplar] is minimal. The amount of general fund money, the impact aid, the GTB, allocated by the Montana Office of Public Instruction is based upon the number of students. Because the number of students in each district will be the same[,] these funds allocated by the Montana Office of Public Instruction will remain the same.

> 33. The Transfer would cause no loss of state or federal funding to [Poplar].

> 37. [Poplar] maintains operating reserves in its General Fund, Transportation, and Retirement Fund. [Poplar] also had $5,889,519 in end fund balance for SY 2017[;] of that amount $3,383,060 is in its Impact Aid Fund. [Poplar] anticipates receiving approximately the same amount of Impact Aid Funds in the current fiscal year. Even with losing the Transfer Territory, state and federal funding would permit [Poplar] to maintain sufficient reserves given the reserves['] current balances and how [Poplar] is funded.

¶23 Poplar contends that the availability of federal funding falls outside the scope of § 20-6-105(6), MCA, and that the Acting Superintendent abused her discretion in considering it. But as Froid points out, the territory transfer statute does not limit the county superintendent's analysis to those criteria expressly listed in the territory transfer statute. The statute's plain language directs the superintendent to consider the impact that the proposed transfer would have on "the economic viability of the proposed new districts, *including but not limited to*" significant taxpayer burden, loss in state funding for students, viability of future bonding capacity, ability to maintain sufficient reserves, and the cumulative effect of other transfers of territory in the previous eight years on the

11

transferring district's taxable value. Section 20-6-105(6)(c), MCA (emphasis added). The statute did not preclude the Acting Superintendent from considering all available funding in assessing economic viability.

¶24 Poplar next argues that "it is undisputed that GTB funding would not alleviate the loss of tax revenue in the other funds sensitive to increases and decreases in taxable valuation[]"—namely, Poplar's transportation and the bus depreciation funds. Ken Taylor testified, however, that the land transfer would not impact the bus depreciation fund. And Deborah McGowan agreed that any anticipated loss in funding would not negatively impact the students. But even assuming that GTB funding could not be used to offset any actual loss of tax revenue in the transportation or bus depreciation funds, Taylor testified that Federal Impact Aid money, on the other hand, "can be used for pretty much anything that you would like it to be used for." And both he and Dan Schmidt testified that the transfer would not impact the availability of Federal Impact Aid funding.

¶25 For these reasons, we are unpersuaded that the Acting Superintendent abused her discretion by considering Poplar's receipt of Federal Impact Aid and GTB funding in her analysis.

**Transportation**

¶26 Section 20-6-105(6)(b), MCA, directs the county superintendent to consider the potential impact a proposed territory transfer will have on student transportation, including but not limited to safety, cost, and travel time of students. Here, the Acting Superintendent made the following findings with respect to transportation:

12

16. Currently the students in the [t]ransfer area are transported to Froid by buses belonging to [Froid].

17. Froid has transported children from the eastern half of the transfer area since 1963 to Froid.

18. Froid has transported children from the western half of the transfer area to Froid since 1994.

19. Froid has newer buses and the drivers are experienced.

20. The eastern boundary of the transfer are[a] is eight miles from Froid and the western boundary is 16 miles from Poplar.

28. Poplar does not provide transportation services to some portions of the Transfer Territory while Froid is currently providing transportation services to most of the elementary-age students in the Transfer Territory. Most students residing in the Transfer Territory have a shorter and safer route to Froid than to Poplar. Froid is able to continue to serve the Transfer Territory with a minimum duplication and cost to the taxpayers.

29. The proposed transfer will improve the safety of student transportation because Froid would be able to send buses into any part of the Transfer Territory as needed to serve particular students which is not currently possible.

On appeal, Poplar asserts that the Acting Superintendent's "heavy reliance" on the "transportation safety issues" was erroneous and that these issues "do not gravitate in favor of either Froid or Poplar" because of the "sheer size" of the Transfer Territory. We disagree.

¶27   The Acting Superintendent's determination regarding these issues finds ample support in the record. For example, Martin Qualley, a life-long resident of the Transfer Territory who has driven a school bus for Froid since 1989, testified that Froid has "safely and efficiently" transported children from the Transfer Territory for "up to 55 years." He also testified that nine of the eleven elementary-age students living in the

13

Transfer Territory attended Froid, while the remaining two attended Poplar, and that Froid lies closer to the Transfer Territory's eastern border than Poplar does to its western border. Both Poplar Superintendent Schmidt and Froid Superintendent Taylor corroborated this testimony.

¶28 Poplar emphasizes testimony by Schmidt and Deborah McGowan that the eleven students in question live in a concentrated area of the Transfer Territory, but it is unclear how or whether this fact shows that granting the transfer would have a negative impact on the safety, cost, or travel time of transporting students to Froid from the Transfer Territory. The Acting Superintendent carefully considered the testimony presented on the effect on student transportation as required under the territory transfer statute. She did not abuse her discretion when concluding that the impact on student transportation weighed in favor of granting the territory transfer.

¶29 In conclusion, the Acting Superintendent's decision to grant the transfer petition was supported by testimony presented at the August 2018 hearing. The District Court correctly determined that the Acting Superintendent did not abuse her discretion.

¶30 *2. Whether the Court should consider Poplar's argument that the territory transfer statute is facially unconstitutional?*

¶31 Poplar contends that the territory transfer statute is unconstitutionally vague on its face. Froid and the Attorney General contend that Poplar's argument is barred by the doctrines of collateral estoppel and res judicata because Judge McKeon resolved the identical challenge during the 2013 territory transfer petition litigation.

¶32 "Collateral estoppel, or issue preclusion, bars the reopening of an issue that has been litigated and determined in a prior suit." *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 15, 331 Mont. 281, 130 P.3d 1267 (citation omitted). Res judicata, or claim preclusion, bars the relitigation of a claim that the party asserting the claim already has had an opportunity to litigate. *Baltrusch*, ¶ 15 (citation omitted). "This includes claims that were or *could have been* litigated in the first action." *Adams v. Two Rivers Apts.,* LLLP, 2019 MT 157, ¶ 8, 396 Mont. 315, 444 P.3d 415 (citation omitted).

¶33 Collateral estoppel applies if: (1) the identical issue raised was previously decided in a prior adjudication; (2) a final judgment on the merits was issued in the prior adjudication; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom preclusion is now asserted was afforded a full and fair opportunity to litigate the issue. *Adams*, ¶ 9 (citation omitted).

¶34 The first collateral estoppel element requires that the issue in the instant case be identical to the issue in the prior case. *Planned Parenthood v. State*, 2015 MT 31, ¶ 13, 378 Mont. 151, 342 P.3d 684 (citation omitted). In other words, the precise question involved in the second case must have been raised and determined in the former case. *Planned Parenthood*, ¶ 13 (citation omitted). We compare the pleadings, evidence and circumstances surrounding the two actions to determine whether the issues are identical. *Baltrusch*, ¶ 25 (citation omitted).

¶35 In litigating the 2013 territory transfer petition, Poplar raised the identical issue of the territory transfer statute's facial validity, arguing, as it does here, that it did not provide reasonably clear and definite standards, objective criteria, and ascertainable limits to guide

15

the acting superintendent in making the transfer decision. That case involved identical circumstances—Froid's petition to acquire the same Transfer Territory from Poplar and Poplar's opposition to the transfer. The first element of collateral estoppel is satisfied.

¶36 The second element also is met. In determining whether there has been a final judgment on the merits, we must look to see "if the issue was actually litigated and adjudged as shown on the face of the judgment." *Gibbs v. Altenhofen*, 2014 MT 200, ¶ 23, 376 Mont. 61, 330 P.3d 458 (citation omitted). The prior decision must have been "adequately deliberated and firm, even if not final in the sense of forming a basis for a judgment already entered[.]" *Baltrusch*, ¶ 22 (quoting Restatement Second of Judgments, § 12, cmt. g (1982)); *see also Gibbs*, ¶ 23 (court adequately deliberated its decision where it heard parties on the issues in briefing and at a summary judgment hearing, and supported its decision with a 10-page opinion).

¶37 In denying Poplar's identical argument and upholding the constitutionality of the territory transfer statute, Judge McKeon "adequately deliberated" his decision. As in *Gibbs*, ¶ 23, he based his determination on briefing by the parties and a summary judgment hearing and devoted seven pages of his order to addressing the territory transfer statute's constitutionality. Poplar had the opportunity to appeal the decision to uphold the territory transfer statute's constitutionality but declined to do so. The decision in the prior adjudication—the 2013 territory transfer petition litigation—was final.

¶38 The third and fourth elements of collateral estoppel similarly are satisfied. Poplar was a party to the 2013 transfer petition case and was afforded a full and fair opportunity to litigate the issue of the territory transfer statute's constitutional validity. It chose for

16

whatever reason not to appeal Judge McKeon's decision upholding the statute's constitutionality. Thus, under the doctrine of collateral estoppel, Poplar is precluded from asserting its facial constitutional challenge to § 20-6-105, MCA.

¶39 Likewise, we conclude that res judicata bars Poplar's facial constitutional challenge to the territory transfer statute. Res judicata applies if the five following elements have been satisfied: (1) the parties or their privies are the same; (2) the subject matter of the present and past actions is the same; (3) the issues are the same and relate to the same subject matter; (4) the capacities of the persons are the same in reference to the subject matter and to the issues; and (5) a final judgment has been entered on the merits in the first action. *Adams*, ¶ 8 (citation omitted).

¶40 Poplar and Froid were parties to the 2013 territory transfer petition litigation. Like the present case, the 2013 case involved Froid's petition to acquire the Transfer Territory from Poplar, which Poplar opposed. Additionally, the issues are the same and relate to the same subject matter: Poplar argues that the Transfer Territory should not be transferred to Froid in part because § 20-6-105, MCA, is facially unconstitutional. Finally, "summary judgment is a final judgment on the merits for purposes of claim preclusion." *Gibbs*, ¶ 13 (citation omitted). As set forth above, Judge McKeon awarded summary judgment to Froid on this very issue, upholding the territory transfer statute's constitutional validity. Accordingly, all five elements of res judicata are satisfied, precluding Poplar's claim that § 20-6-105, MCA, is unconstitutional on its face.[2]

---

[2] Poplar asserts that the finality element is not satisfied for purposes of collateral estoppel or res judicata. Its arguments sidestep the well-settled requirements for finality under both doctrines

17

¶41    *3. Whether the territory transfer statute is unconstitutional as applied to Poplar?*

¶42    Poplar asserts that the District Court violated its due process rights by impermissibly relying on the fact that tax-exempt tribal lands make up the Transfer Territory and that Poplar receives significant federal funding to mitigate the effect of the transfer. But as the Attorney General points out, Poplar—a political subdivision of the State—does not possess a due process right. *See, e.g., The Associated Press v. Bd. of Pub. Educ.*, 246 Mont. 386, 390, 804 P.2d 376, 379 (1991) ("State agencies have never been included under the umbrella of the right to due process[,]" which "were designed to protect people from governmental abuses[]" and not "to protect the government from the people.").

## CONCLUSION

¶43    The Acting Superintendent did not abuse her discretion in granting Froid's territory transfer petition. The order of the District Court is affirmed.


                                                  /S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

---

and are not well-taken. *See, e.g., Tungsten Holdings, Inc. v. Kimberlin*, 2000 MT 24, ¶ 36, 298 Mont. 176, 994 P.2d 1114 (party's failure to cross-appeal summary judgment ruling in prior case barred relitigation of that claim in subsequent proceeding under claim preclusion); *Brilz v. Metro. Gen. Ins. Co.*, 2012 MT 184, ¶ 26, 366 Mont. 78, 285 P.3d 494 ("[W]e have held that summary judgment is a final judgment on the merits for purposes of claim preclusion."); *Gibbs*, ¶ 23 (issue preclusion applies where summary judgment determination in prior action was subject to appeal and party declined to exercise right to appeal).